# United States Court of Appeals
# for the Federal Circuit

———————————

**ENERGY RECOVERY, INC.,**
*Plaintiff-Appellee,*

**v.**

**LEIF J. HAUGE,**
*Defendant-Appellant,*

AND

**ENERGY RECOVERY INTERNATIONAL, INC.,**
*Defendant.*

———————————

2013-1515

———————————

Appeal from the United States District Court for the Eastern District of Virginia in No. 00-CV-0431, Judge Raymond Alvin Jackson.

———————————

Decided: March 20, 2014

———————————

STEPHEN E. NOONA, Kaufman & Canoles, P.C., of Norfolk, Virginia, argued for plaintiff-appellee.

RICHARD A. STERBA, Fish & Richardson P.C., of Washington, DC, argued for defendant-appellant. With him on the brief was AHMED J. DAVIS.

---

Before RADER, *Chief Judge,* REYNA, and WALLACH, *Circuit Judges.*

WALLACH, *Circuit Judge.*

Leif J. Hauge appeals the district court's decision finding him in contempt of that court's March 19, 2001, Order (the "2001 Order"), which adopted Mr. Hauge and Energy Recovery, Inc.'s ("ERI") March 16, 2001, Settlement Agreement (the "Agreement"). For the reasons set forth below, this court reverses the contempt finding and vacates the injunction.

### BACKGROUND

The dispute between Mr. Hauge and his former employer, ERI, began more than thirteen years ago over ownership of intellectual property rights related to "pressure exchangers," a type of energy recovery device used in reverse osmosis. On March 16, 2001, the parties entered into the Agreement resolving the litigation. Three days later, the district court adopted the Agreement and issued the 2001 Order, stating that ERI was to be the sole owner of three U.S. patents and one pending U.S. patent application: U.S. Patent Nos. 4,887,942, 5,338,158, and 5,988,993, and U.S. Patent Application No. 09/508,694, which later issued as U.S. Patent No. 6,659,731.[1]

The Agreement and subsequent Order obligated Mr. Hauge to transfer ownership not only of the patents, but

---

[1] The Agreement required Mr. Hauge to "cooperate fully in executing any and all documents necessary to prosecute, assign, record, perfect, and/or maintain the Patents and/or Patent Applications in Energy Recovery's name or for Energy Recovery's benefit in the United States and throughout the world." J.A. 17.

also "all other intellectual property and other rights relating to pressure exchanger technology" pre-dating the Agreement and 2001 Order. J.A. 10, 16. The Agreement states: "[t]his assignment and transfer of rights is not intended to extend to inventions by Hauge . . . made after the date of this Agreement." J.A. 16. The Agreement also contains a non-compete clause, prohibiting Mr. Hauge from making or selling energy recovery devices for use in reverse osmosis salt water desalination for two years from the date of the Agreement. J.A. 18.

After the expiration of the non-compete clause, on August 10, 2004, Mr. Hauge filed a provisional patent application, titled "Pressure Exchanger," and filed a utility application one year later. U.S. Patent No. 7,306,437 (the "'437 patent") issued on December 11, 2007. Its abstract describes "[a] pressure exchanger for transferring pressure energy from a high-pressure fluid stream to low-pressure fluid stream." '437 patent, at [57].[2]

In 2009, Mr. Hauge arranged a meeting with ERI on behalf of his new company, Isobaric Strategies, Inc. ("Isobarix"). In subsequent correspondence, Mr. Hauge wrote "the main topic under consideration was the possibility of uniting all pressure exchanger technology and [intellectual property] rights under the umbrella of [ERI] and the potential benefits to those concerned." J.A. 85. ERI ultimately declined to "get involved in [Mr. Hauge's] project" and wished him "success with current and future endeavors." J.A. 84. After ERI's rejection of Mr. Hauge's proposal, Mr. Hauge, through Isobarix, began selling a pressure exchanger based on the '437 patent, called "XPR." In 2010, Mr. Hauge created a consulting agreement for two ERI employees, Tristan

---

[2] The district court refers to this patent as both "patent '734" and "patent '437."

Nillo and James Coyle, regarding services they could provide to Isobarix; they ultimately contracted with Isobarix.

On September 11, 2012, ERI filed a Motion for Order to Show Cause, alleging Mr. Hauge was using ERI's proprietary technology in the manufacture of the XPR pressure exchanger, in violation of the district court's 2001 Order. ERI submitted the declaration of an expert who testified that Mr. "Hauge and Isobarix are using 'pressure exchanger technology' from pre-March 19, 2001[,] in both the design and manufacture of the Isobarix pressure exchanger," which the expert opined is "virtually identical to the ERI pressure exchanger" in terms of operation. J.A. 237. At the hearing, Mr. Hauge's counsel argued that ERI had failed to show that the allegedly proprietary technology was protectable as a trade secret, and argued that Mr. Hauge was not prohibited from using the technology because the Agreement related only to transfer of ownership of the patents and proprietary technology pre-dating the Agreement.

After holding a Show Cause Hearing on June 24, 2013, the court entered an order (the "Contempt Order") finding that allowing Mr. Hauge "to . . . develop new products using the very technology he assigned to ERI solely because those new inventions post-date the Agreement would render the Settlement Agreement and its assignment of ownership rights useless." J.A. 4. The court entered judgment that Mr. Hauge was in violation of the 2001 Order, found him in contempt, and further enjoined him and Isobarix "from manufacturing and selling pressure exchangers and replacement parts for ERI's pressure exchangers." J.A. 9. The court also awarded ERI attorneys' fees and ordered it to file a request for damages and reasonable attorneys' fees within thirty days.

In September 2013, Mr. Hauge filed a Motion for Order to Stay the Permanent Injunction, which this court granted, stating "[t]he district court's June 25, 2013[,] [O]rder, including the provision enjoining Hauge and Isobarix from manufacturing and selling pressure exchangers and replacement parts for [ERI]'s pressure exchangers, is stayed pending appeal." Ct. Order at 2, *Energy Recovery Inc. v. Hauge*, No. 2013-1515 (Fed. Cir. Sept. 13, 2013), (ECF No. 19) (order granting motion to stay).

## DISCUSSION

## I. Jurisdiction

This court has jurisdiction over interlocutory orders modifying an injunction. *See* 28 U.S.C. § 1292(c)(1) (2012).

Even though no final disposition has been made regarding the amount of contempt damages and attorneys' fees, the district court's Contempt Order is appealable under § 1292(c)(1) because it modified the scope of the 2001 Order. In relevant part, the 2001 Order declared ERI the sole owner of all "intellectual property and other rights relating to pressure exchanger technology predating this Order." J.A. 5. In contrast, the Contempt Order for the first time prohibits Mr. Hauge from engaging in certain acts, and therefore modifies the 2001 Order. Specifically, the Contempt Order enjoins Mr. Hauge "from manufacturing and selling pressure exchangers and replacement parts for ERI's pressure exchangers." J.A. 9. Accordingly, because it modifies the substance of the 2001 Order, the Contempt Order is appealable.

## II. Standard of Review

"Regional circuit law governs contempt proceedings that do not raise issues unique to patent law." *Schaefer Fan Co., Inc. v. J & D Mfg.*, 265 F.3d 1282, 1289 (Fed. Cir.

2001). In the Fourth Circuit, a district court's grant or denial of a civil contempt motion is reviewed for an abuse of discretion. *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000). "When a district court's decision is based on an interpretation of its own order, our review is even more deferential because district courts are in the best position to interpret their own orders." *JTH Tax, Inc. v. H & R Block E. Tax Servs. Inc.*, 359 F.3d 699, 705 (4th Cir. 2004) (citing *Vaughns v. Bd. of Educ.*, 758 F.2d 983, 989 (4th Cir. 1985)). However, "[c]ontempt is a weighty penalty and should not be casually imposed." *In re Wilson*, 199 F.3d 1329, 1999 WL 976491, at *2 (4th Cir. 1999); *see also TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 881–82 (Fed. Cir. 2011) (en banc) (Contempt "is a severe remedy, and should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct.") (internal quotation marks and citation omitted).

An abuse of discretion may be found when the district court's decision is "'guided by erroneous legal principles' or 'rests upon a clearly erroneous factual finding.'" *Brown v. Nucor Corp.*, 576 F.3d 149, 161 (4th Cir. 2009) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)).

### III. The Contempt Finding

To establish civil contempt, clear and convincing evidence must support each of the following elements:

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's favor; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result.

*Ashcraft*, 218 F.3d at 301 (citation omitted). At issue in this case is element (3): whether Mr. Hauge by his conduct violated any terms of the district court's 2001 Order.

Mr. Hauge argues he did not violate any provision of the 2001 Order. He contends that in reaching the Agreement the parties were both aware of the possibility that he would eventually compete with ERI by selling devices in the pressure exchanger industry. As support, he claims (1) the Agreement only required transfer of his ownership rights to the intellectual property pre-dating the Agreement; (2) the non-compete clause had a limited two-year duration; and (3) the Agreement explicitly provided that the transfer of ownership rights did not extend to inventions after the date of the Agreement. ERI responds that Mr. Hauge is free to develop and commercialize new technology relating to the energy recovery field; he is not, however, able "to appropriate the very pressure exchanger technology" that he explicitly transferred to ERI in 2001. Appellee's Br. 21.

ERI further emphasizes the "tremendous effort and money" spent developing the allegedly proprietary technology pre-dating the Agreement. Appellee's Br. 8. To ERI, Mr. Hauge is necessarily employing the same proprietary technology he agreed to transfer. It relies on evidence that Mr. Hauge hired two of ERI's employees who set up Isobarix's facility, similar to that of ERI's pre-2001 facility, and that the Isobarix pressure exchanger is made "out of essentially the same ceramic material" as ERI's, the manipulation of which requires special techniques not known outside of ERI. Appellee's Br. 18.

None of Mr. Hauge's challenged conduct violates any provision of the 2001 Order. Paragraph One of the Agreement begins with the heading "ABSOLUTE TRANSFER OF ALL RIGHTS IN PATENTS, PATENT APPLICATIONS AND ALL RELATED INTELLECTUAL

PROPERTY, TO ENERGY RECOVERY." J.A. 16. The remainder of the paragraph details that Mr. Hauge "irrevocably and absolutely assign[s]" to ERI "all right, title and interest along with any and all patent rights," J.A. 16, which Mr. Hauge had in "(i) the patents and patent applications . . . ; (ii) any and all patent rights . . . , intellectual property rights, property rights . . . ; and (iv) all other intellectual property and other rights relating to pressure exchanger technology predating this Order." J.A. 10. Only clause (iv) is at issue. *See* J.A. 57 (ERI's counsel explained to the district court that "[t]he [issue] that is in question . . . for this hearing, it's not patents, it's not the applications for patents, but it is No. 4 in the [O]rder, '[a]ll other intellectual property and other rights relating to pressure exchanger technology predating this [O]rder.'").

The Agreement only required Mr. Hauge to transfer ownership of the pre-Agreement pressure exchanger intellectual property; "cooperate fully in executing any and all documents necessary" to do so; refrain from competing for two years; and announce in a press release that ERI was the "sole source for Pressure Exchangers built pursuant to such patents, patent applications, and technology." J.A. 17, 32. Nothing in the 2001 Order expressly precludes Mr. Hauge from using any manufacturing process.

Mr. Hauge's manufacture of the XPR pressure exchanger is not inconsistent with the 2001 Order's requirement that Mr. Hauge transfer all "intellectual property and other rights relating to pressure exchanger technology *pre-dating this Agreement*." J.A. 16 (emphasis added). Civil contempt is an appropriate sanction only if the district court can point to an order of the court which "sets forth in specific detail an unequivocal command which a party has violated." *In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995) (internal quotation marks

and citation omitted). ERI cannot point to such a command. Mr. Hauge is not claiming ownership of ERI's intellectual property. Nor did Mr. Hauge start selling pressure exchanger products before the expiration of the Agreement's non-compete clause. Finally, if in fact Mr. Hauge is using ERI's manufacturing processes, he may be in violation of the patent laws or state trade secret laws, but he is not in violation of any "unequivocal command" in the 2001 Order. *See id.* (civil contempt requires violation of "an unequivocal command" in the underlying court order).

To the extent the "sole source" language in the Agreement puts an affirmative duty on Mr. Hauge not to create pressure exchangers pursuant to ERI's intellectual property, an infringement analysis would be necessary to determine whether such a violation occurred. As recognized by the district court and conceded by both parties, the instant contempt proceeding does not implicate patent infringement. ERI's counsel stated "[n]ow, I don't want to be quoted later as saying that [the '437 patent] doesn't violate our patents . . . . [T]here's an argument . . . that practicing the new patent violates an earlier patent, but that's for another day." J.A. 59. Mr. Hauge's counsel agreed, responding, "Mr. Noona is correct that if there is a patent infringement lawsuit, we can deal with those issues on another day." J.A. 64. The district court explicitly declined to address infringement, determining that a formal finding of infringement was unnecessary because it was Mr. Hauge's use of ERI's allegedly proprietary manufacturing processes that was problematic, not the patented pressure exchanger technology. The district court stated: "[A]lthough the [c]ourt expresses no judgment as to the separate issue of whether Defendant is actually infringing ERI's patents, [Mr. Hauge] does little to dispel any doubt that he is in fact using ERI's technology." J.A. 7. Because ERI

explicitly stated during the contempt hearing that it was not alleging contempt on the basis that Mr. Hauge's new pressure exchanger, as described in the '437 patent, infringes any of ERI's patents, *see* J.A. at 59, the district court was not required to address patent infringement.[3]

The district court was also concerned by Mr. Hauge's conduct in hiring two (then current) employees of ERI. Mr. Hauge admitted hiring the ERI employees, explaining they were "skilled trade persons . . . and of course no one would hire at this cost and expect no benefit from past work experience." J.A. 7. Mr. Hauge's professed motivation for the hires was that when he was the president of ERI, "we basically went through the complete setup of commercial production. And what we were about to do was pretty much all over again doing what I did in [19]98." J.A. 7. This conduct does not violate any

---

[3] Additionally, because the 2001 Order contains no injunction against infringement, Mr. Hauge is incorrect to argue that the district court should have applied the "colorable differences" test. *See, e.g.*, *Panduit Corp. v. HellermannTyton Corp.*, 451 F.3d 819, 827 (Fed. Cir. 2006). Under this test, "[t]he primary question on contempt should be whether the newly accused product is so different from the product previously found to infringe that it raises a fair ground of doubt as to the wrongfulness of the defendant's conduct." *TiVo*, 646 F.3d at 882 (internal quotation marks and citation omitted). Because Mr. Hauge was never found to have infringed any of ERI's patents in the underlying action, there is no adjudicated infringing product to compare to Mr. Hauge's new pressure exchanger to determine whether their differences are more than "colorable." Accordingly, even if ERI had argued during the contempt proceedings that Mr. Hauge's conduct constituted patent infringement, the district court was not required to address the "colorable differences" test to find contempt.

provision of the 2001 Order, however. While it may constitute trade secret misappropriation, that would not justify a finding of contempt in this case. Notably, ERI's trade secret claim in California state court based on the same conduct resulted in a unanimous jury verdict in favor of Mr. Hauge. Appellant's Notice of Supplemental Authority at 1, *Energy Recovery Inc. v. Hauge*, No. 2013-1515 (ECF No. 33) (Dec. 19, 2013) (quoting Attach. 1: Special Verdict Format 8 ("26. Did Leif Hauge misappropriate any trade secrets of Energy Recovery, Inc.? NO.")).

The district court found that Mr. Hauge had "violated the letter and spirit of the [] Agreement." J.A. 8. However, the Supreme Court has explained that a consent decree must be discerned within its four corners:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. *Thus the decree itself cannot be said to have a purpose*; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. *For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.*

*United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971) (footnote omitted) (emphases added); *see also Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984). Because Mr. Hauge did not violate any provision of the 2001 Order, the district court abused its discretion in holding Mr. Hauge in contempt. That finding is accordingly reversed.

## IV. The Injunction

A district court may fashion a remedy for civil contempt to the extent it is necessary to enforce compliance with its orders. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949) (explaining "[w]e are dealing here with the power of a court to grant the relief that is necessary to effect compliance with its decree. The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief.") Because the finding of contempt is reversed, there is no remedy necessary; the injunction is therefore vacated.[4]

## CONCLUSION

For the foregoing reasons, the district court's finding of civil contempt is reversed and its grant of the injunction is vacated.

---

[4] In any case, the injunction is also overbroad. "A federal district court may not use its power of enforcing consent decrees to enlarge or diminish the duties on which the parties have agreed and which the court has approved." *Johnson v. Robinson*, 987 F.2d 1043, 1046 (4th Cir. 1993). The injunction prohibits Mr. Hauge from selling *any* pressure exchanger, which is inconsistent with the language in the Agreement that explicitly allows him to compete with ERI after two years. It improperly expands the scope of the consent decree, subjecting it to vacation.

**REVERSED AND VACATED**